UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

BERNIE JOHN SPRAGUE,

                    Plaintiff,              Case No.: 11-13492
                                            Honorable Patrick J. Duggan
          v.                                Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 11]

Plaintiff Bernie Sprague brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.      **RECOMMENDATION**

For the reasons set forth below, the court finds that the ALJ's decision is not supported by substantial evidence in the record. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [11] be DENIED, Sprague's motion [8] be GRANTED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REVERSED AND REMANDED for further consideration consistent with this Report and Recommendation.

II.     **REPORT**

A.     **Procedural History**

On May 19, 2008, Sprague filed applications for DIB and SSI, alleging disability as of June 30, 2006.  (Tr. 99-105).  The claims were denied initially on August 15, 2008.  (Tr. 46-54).  Thereafter, Sprague filed a timely request for an administrative hearing, which was held on March 15, 2010, before ALJ Andrew Sloss.  (Tr. 27-42).  Sprague, represented by attorney David Stewart, testified, as did Vocational Expert ("VE"), Ann Tremblay.  (*Id.*; Tr. 97-98).  On June 17, 2010, the ALJ found Sprague not disabled.  (Tr. 12-26).  On July 1, 2011, the Appeals Council denied review.  (Tr. 1-4).  Sprague filed for judicial review of the final decision on August 11, 2011 [1].

B.     **Background**

1.     *Disability Reports*

In a disability report dated June 4, 2008, Sprague reported that the conditions preventing him from working were attention deficit hyperactivity disorder ("ADHD") and bipolar disorder.  (Tr. 126).  He reported that these conditions prevented him from working because he had problems with concentration and memory, he was depressed and had trouble leaving the house, and his disorder "leaves me with no regard for authority.  I can't keep a job because I always have problems with the boss and quit or get fired."  (*Id.*).  He reported that he stopped working on his alleged onset date because he was "hollering at the boss and quit."  (*Id.*).  He did not report being treated by any doctors or taking any medications for his conditions.  (Tr. 128-29).

In an adult function report dated June 17, 2008, Sprague reported that his illness limits his activities in that he "can't be around people[;] don't like people, don't trust anybody."  (Tr. 146).  He reported that he lives alone in a house and his daily activities include laying on the

2

couch or bed and watching television.  (*Id.*).  He reported that he wished he could work around people and have a friend.  (*Id.*).  Sprague reported that he has no trouble with his personal care and that he has a dog that he cares for.  (Tr. 147-48).  He reported that he does not go to the doctor because he does not "trust them."  (Tr. 148).

Sprague prepares meals daily for himself and only occasionally performs housework because he does not "care to do it."  (Tr. 149-49).  He reported that he does not go out because he does not like to meet people and does not trust them.  (Tr. 149).  He reported that he does not drive because he neither has a car nor a license, but that he shops for food twice a month.  (*Id.*).  He is capable of paying bills, counting change and handling a savings account, but not a checking account because he does not trust himself with a checkbook.  (*Id.*).  His hobbies had previously consisted of fishing and watching television but he claimed he does not fish anymore because he does not go anywhere anymore.  (Tr. 150).  He reported having problems with getting along with family and friends because he believes everyone was trying to take advantage of him. (Tr. 151).

Sprague reported that his conditions affect his ability to complete tasks, concentrate, understand, follow instructions and get along with others.  (*Id.*).  He reported that he does not "like to finish things," his brain wanders off and he does not like people.  (*Id.*).  He reported not knowing for how long he could pay attention, although he said he could follow written and oral instructions well "if I understand [them]."  (*Id.*).  He reported not getting along well with authority figures and that he lost jobs because he would lose his temper.  (Tr. 152).  He does not handle stress well and does not like people "messing" with him.  (*Id.*).  He reported no physical limitations.  (Tr. 151).

In a disability appeals report dated September 20, 2008, Sprague reported that his

condition had changed since his last report in that he had been diagnosed with Hepatitis C. (Tr. 157). He reported no change in his physical or mental limitations since his last report. (*Id.*). He did report being treated by doctors for his mental conditions in September 2008, and that he received medication, but he did not list the medication he had received. (Tr. 158-59). However, in an undated medications form, Sprague reported being prescribed Adderall for his ADHD, Ambien to help him sleep and Trazodone for depression. (Tr. 173). In a recent medical treatment form, Sprague reported being treated by Dr. Hanif Khan, Dr. Bhrany Anjana and a Dr. Vora, who gave him medicine. (Tr. 175).

### 2.   *Plaintiff's Testimony*

At a March 15, 2010 hearing before the ALJ, Sprague testified that he completed only the 9th grade in school and spent some time in prison. (Tr. 30). He testified he had problems with going to work, getting mad and quitting. (Tr. 31). He testified that he had been diagnosed with bipolar disorder which caused him to have racing thoughts and problems functioning. (Tr. 31-32). Sprague testified he was treated for his condition by a psychiatrist, a case worker and a counselor. (Tr. 32). He testified that he had been treated on and off over the last couple of years and that he would go only when he started having problems. (*Id.*). He testified that he had a history of substance abuse but that he had been sober since May 15, 2009. (*Id.*). Sprague testified that his daily activities included walking his dog, staying in his house "a lot", except to go see his doctor and counselor, and collecting antique pop bottles. (Tr. 32-33). Sprague also testified that he had problems with his right shoulder causing him pain and that he had been receiving treatment for it "on and off" since 1988. (Tr. 33).

Sprague testified that he had been hospitalized for suicide attempts on two different occasions, and had previously threatened to shoot himself. (Tr. 34). His conditions caused him

to get very sad and depressed and feel helpless and hopeless at times. (*Id.*). He had trouble finishing projects at home and also keeping his temper in check. (Tr. 34-35). He testified that he did not like being around people because he did not trust them. (Tr. 35). This has been his feeling most of his life. (*Id.*). Sprague testified that he had sometimes been fired from his jobs, and other times he just got angry and quit. (*Id.*). Either way, the driving factor was his temper. (Tr. 36). He testified that he had problems with his shoulder which often required him to put it in a sling for comfort. (Tr. 37). He testified that he was supposed to go to physical therapy, but because of some issue that was illegible in the transcript, he now needed to be seen by a different doctor. (*Id.*).

        *3.*    *Medical Evidence*

           *a.*    *Mental Conditions*

                *i.*    *Treating Sources*

On September 4, 2008, Sprague voluntarily admitted himself for inpatient psychiatric treatment (which lasted almost a week) purportedly due to suicidal thoughts and his having purportedly stuck a friend's gun in his mouth without pulling the trigger. (Tr. 225-87; 312-63; 425-43).[1] Upon admission, Sprague stated he was tired of being a drug addict and was going to kill himself by putting a friend's gun in his mouth and that his friends brought him to treatment. (Tr. 340; 344). He had last used heroin the prior day. (*Id.*; 317). The admitting physician, Dr. Janet Warner, diagnosed Sprague with a mood disorder NOS, opioid dependence and withdrawal and assessed a GAF score of 15. (Tr. 342; 346). In consultation with another physician, Dr. Paul Musson, Sprague reported that his purported suicide attempt was related to multiple

---

[1] The following day, September 5, 2008, Sprague told his case manager that he had never been suicidal, but had been instructed to say so in order to gain access to treatment for his heroin addiction. (Tr. 312).

stressors in his life, including the fact that he had had 15 jobs over the course of three years, all of which he either quit or was fired from, due to insubordination.  (Tr. 317).  He admitted having a "long history of problems with authority."  (*Id.*).  Dr. Musson diagnosed Sprague with opiate dependence, benzodiazepine abuse, attention deficit disorder ("ADD"), ADHD, bipolar disorder and schizophrenia, and prescribed intramuscular Buprenorphine, Ativan, Lexapro and Zyprexa. (Tr. 318).  Again, however, this was all prior to his disclosure that he had not been suicidal at the time.  *Supra*, fn. 1.

During the first several days of his hospital admission, Sprague refused to participate in individual or group therapy sessions as prescribed.  (Tr. 276-80).  However, toward the end of his treatment he began to participate in therapy sessions both individually and as part of a group. (*Id.*).  Upon discharge, Dr. Warner and nurse practitioner Denise Will noted that Sprague was "admitted to the unit so that he could detox from heroin."  (Tr. 433-34).  They found him, although "initially somewhat isolative and guarded" was upon discharge "generally pleasant and cooperative."  (Tr. 433).  Sprague denied any hallucinations, paranoia, or suicidal or homicidal thoughts.  (*Id.*).  He was diagnosed with a mood disorder, not otherwise specified, and opioid dependence, assessed a GAF score of 35 and discharged with prescriptions for Celexa and Restoril, and with instructions to follow up with a community mental health organization for outpatient treatment.  (*Id.*).

On March 16, 2009, Sprague again admitted himself to inpatient mental health treatment for suicidal ideation.  (Tr. 366-421; 477-542).  Upon admission he was alert, oriented and cooperative, although depressed, hopeless and helpless.  (Tr. 388).  However, another treatment note stated that Sprague was "quite guarded and uncooperative during the admission process." (Tr. 489).  His appearance, behavior and speech were within normal limits.  (Tr. 395).  He was

diagnosed with a mood disorder and antisocial personality and assessed a GAF score of 28. (Tr. 517). He tested positive for heroin and opiates. (Tr. 398). On March 17, 2009, Sprague was found to have poor compliance with treatment and a substance abuse history that he refused to discuss. (Tr. 407). He was assessed GAF score of 20. (*Id.*). He remained in treatment until March 23, 2009, and was prescribed antidepressant medications. (*Id.*; 489). Again, on the first two days of his treatment, he refused to participate in individual or group therapy, eventually coming around to participating by the end of his treatment. (Tr. 406-409). Sprague stated in a therapy session that he believed all doctors were crooked and would write prescriptions for anything. (Tr. 408). He also stated that he would sell his own medication for heroin. (*Id.*). During his treatment he told his caseworker that he was doing better and that he just needed to stay off heroin. (Tr. 494-95). At the beginning of his treatment he presented with an aloof attitude, dysphoric mood, and blunt affect. His thought process was obsessed and his attention, impulse control and judgment were all impaired. (Tr. 500). At discharge, Sprague denied suicidal or homicidal ideations and showed no aggression. (Tr. 480; 489). His attitude was cooperative, his mood euthymic, his affect, speech and though processes within normal limits, and his attention, impulse control and judgment all adequate. (Tr. 490). He was diagnosed with mood disorder, NOS and antisocial personality disorder and assessed a GAF score of 70. (Tr. 489).

A crisis screening was conducted on January 22, 2010, by the community mental health center for the purposes of evaluating the need for inpatient treatment. (Tr. 632-45). Sprague reported that he had met with his primary care physician the day before, but had "cussed her out because she would not refill his psychotropic med[ication]s." (Tr. 633). Sprague reported that he was depressed most days, was nervous, worrisome, had racing thoughts and that, in the last

two weeks, he had thoughts of hurting himself or someone else.  (Tr. 635).  He reported that he

had significant problems getting along with others, keeping a job and adapting to changes or

stressful events, and moderate problems concentrating or paying attention.  (Tr. 635).  At his

interview, Sprague was alert and oriented, but his mood was sad and irritable.  (Tr. 644).  He had

daily thoughts of harming others but had been able to control his behavior to this point.  (*Id.*).

He also utilized alternative behaviors such as exercise to prevent physically acting out.  (*Id.*).  He

understood that treatment would help him and he was able to identify and verbalize his needs.

Sprague was diagnosed by licensed medical social worker Joseph Novak with opioid dependency

in remission and mood disorder NOS.  (Tr. 639).  He was determined to be "reasonably expected

within the near future to physically injure himself or another individual, either intentionally or

unintentionally," and it was found that his

> judgment is so impaired that he is unable to understand the need for
> treatment and, in the opinion of the mental health professional, his
> continued behavior, as a result of the mental illness, developmental
> disability or emotional disturbance, can be reasonably in the near future to
> result in physical harm to the individual or to another individual.

(Tr. 641).  His GAF score was assessed at 50.  (*Id.*).  Sprague was determined to have retained

80% of his functions.  (Tr. 635).  He was admitted to outpatient care with New Passages Crisis

Center.  (Tr. 643).

A January 23, 2010, progress note from New Passages noted that Sprague reported to Dr.

Hanif Khan high levels of depression, mood swings, irritability and anxiety since his primary

care physician declined to renew his psychiatric medications.  (Tr. 657).  Sprague presented with

"irritable and depressed affect" although he was alert and oriented.  (*Id.*).  A progress note from

January 25, 2010, revealed that Sprague's depression was a 7 out of 10 and his anxiety was a 6

out of 10.  (Tr. 655).  His activities of daily living were fair, but his sleep and appetite were poor.

(*Id.*).  Sprague reported that he stopped taking Lithium because it did not make him feel any different.  (*Id.*).  At the interview with Dr. Khan, Sprague was alert and oriented, with appropriate communication skills and good eye contact.  (*Id.*).  However he had a sad affect, depressed mood and was poorly groomed.  (*Id.*).  His notable risk factors were lack of support, fear of losing control and fear of being controlled.  (Tr. 656).

A psychiatric evaluation was performed on the same day, by Dr. Khan.  (Tr. 621-26).  Sprague reported that since being off heroin (which he had been off for seven months), he had never felt better – he had begun lifting weights, got a dog and quit smoking.  (Tr. 623).  "He feels his concentration has improved with Adderall and he is able to focus and get things done and would like to continue taking his medication and not change anything."  (*Id.*).  During the interview Sprague was cooperative and pleasant, his mood was euthymic and his affect was mood congruent.  (*Id.*).  He was alert and oriented and his memory, insight and judgment were fair.  (*Id.*).  Sprague was diagnosed by Dr. Khan with ADHD, inattentive type, mood disorder NOS and opioid dependence.  (Tr. 625).  His GAF score was 49.  (*Id.*).  Dr. Khan prescribed Desyrel, Ambien and Adderall.  (Tr. 626).

Progress notes from January 26, 2010 indicated that Sprague received his medications and began taking them.  (Tr. 653).  He reported that "he feels that he will be okay taking his medications and going to therapy."  (*Id.*).  He denied any suicidal actions and he talked about his determination to remain on his medications and stay sober.  (*Id.*).  At the interview with Dr. Khan, Sprague was alert and oriented, with appropriate communication skills, affect and mood. (*Id.*).  His risk factors included lack of support and medical health risks.  (Tr. 654).  Progress notes from a January 28, 2010 appointment with his case manager revealed that Sprague had not been sleeping well despite his medications.  (Tr. 651).  Sprague also reported that he would feel

better if he had more money, that his heat and water were at risk of being cut off and that he had

been denied social security insurance and felt that "he was cheated out of money." (*Id.*). During

the interview, Sprague was alert, oriented and coherent, his affect and mood were appropriate

and his appetite was fair. (*Id.*). His only notable risk factor was medical health problems. (Tr.

652).

A psychosocial assessment was conducted by the community mental health clinic on

February 23, 2010. (Tr. 597-615). Sprague reported that, in addition to his two inpatient

treatments for mental health issue, he had also participated in residential treatment for his

substance abuse in May 2009. (Tr. 598). He sought community health treatment because his

medications were running out. (*Id.*). His current symptoms were sleeplessness, mood swings,

aggressiveness, anger, inability to remember, obsessive thoughts and pain. (Tr. 599). He was

currently taking Adderall, Ambien and Trazodone. (Tr. 600). Sprague reported still living alone

and being able to take care of himself, but having no real supportive family. (Tr. 601-602). He

reported difficulty concentrating and behavioral problems. (Tr. 602). He no longer had suicidal

thoughts, although he admitted to having them in the past. (Tr. 604).

At the interview, Sprague was found to be alert and oriented, cooperative, calm and very

talkative, with a regulated mood and normal affect. (Tr. 607). He reported a history of agitation

and fear of becoming physically aggressive. (*Id.*). He also reported depression without his

psychotropic medications. (*Id.*). Although he previously spent much of his day thinking about

how he might respond to the agitating conduct of others, he currently had no reports of violence

or thoughts of violence against others. (Tr. 609). The practitioner had concerns about Sprague's

family and social relationships, and his work, finances and physical health. (Tr. 610). His

strengths were found to be his daily activities, his cognitive functioning, housing, social skills,

impulse control and responsibility. (*Id.*). His diagnoses were unchanged except that a diagnosis of post-traumatic stress disorder was added, (presumably due to unrelated childhood physical and sexual abuse Sprague disclosed during the interview). A GAF rendered by Dr. Khan was also unchanged from his January 2010 assessment of 49. (*Id.*).

### ii.    Consultative and Non-Examining Sources

Sprague underwent a consultative examination for the State of Michigan on August 1, 2008, with Dr. Nikhil Vora. (Tr. 182-85). Sprague reported that he was diagnosed as bipolar in 1993 when he was in prison. (Tr. 182). He had been in prison three times for a total of twelve years. (*Id.*). He had been diagnosed with ADHD as a child. (*Id.*). Sprague complained of mood swings and anger issues, but no manic or hypomanic episodes. (*Id.*). He reported past substance abuse including alcohol, cocaine, marijuana, and intravenous heroin, but that he had not abused drugs for the past thirteen years. (*Id.*). Sprague reported living alone and being withdrawn and isolated from family and friends. (Tr. 183). He participated in no current hobbies, although he used to like to hunt and fish. (*Id.*). He reported being able to care for himself, his house and go shopping. (*Id.*). He did not attend church or any other social activity. (*Id.*). A neighbor drove him to the appointment. (*Id.*). Sprague claimed to hear voices telling him to be good, and he feels that the government is after him. (*Id.*). He feels depressed, hopeless and worthless most of the time and sometimes has crying spells. (*Id.*).

Upon examination, Dr. Vora noted that Sprague had good contact with reality, low self-esteem and was cooperative in the interview. (*Id.*). He found Sprague's affect flat, and his mood dysphoric, anxious and paranoid. (Tr. 184). Sprague was able to repeat six digits forward, three backward, recall three objects after three minutes, name three presidents, five large cities, the current president and the mayor of Flint. (*Id.*). He could do some, but not all, simple

11

calculations but could not interpret either of two proverbs.  He was able to distinguish between a tree and a bush and make adequate judgments regarding two different scenarios.  (*Id.*).  Dr. Vora diagnosed Sprague with ADHD, inattentive type, a learning disorder not otherwise specified ("NOS"), psychosis, NOS, and polysubstance dependency.  (Tr. 185).  He also diagnosed Sprague with borderline intellectual functioning.  (*Id.*).  Dr. Vora assessed Sprague a global assessment of functioning ("GAF") score of 45, and noted that his past GAF score had also been 45.  (*Id.*).  Dr. Vora gave Sprague a guarded prognosis.  (*Id.*).

A psychiatric review technique form was completed on August 15, 2008, by Dr. Leonard Balunas, for the timeframe between May 7, 2008, and August 14, 2008.  (Tr. 188-201).  He concluded that Sprague suffered from an organic mental disorder, specifically ADHD, and a substance abuse disorder.  (Tr. 188-89).  He found that Sprague had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace ("CPP"), and no episodes of decompensation. (Tr. 198).  Dr. Balunas rejected the portions of Dr. Vora's evaluation diagnosing a learning disability and borderline intellectual functioning, stating that there was "no historic, clinical or psychometric test data to support" those diagnoses.  (Tr. 200).  He also rejected Dr. Vora's diagnosis of psychosis, NOS, because he said it was "based solely on unsupported claimant allegations of auditory hallucinations and is not supported by objective clinical signs."  (*Id.*).  On the same day another psychiatric review technique form was completed by Dr. Balunas for the period between June 30, 2006, and March 31, 2008.  (Tr. 202-215).  There, Dr. Balunas concluded there was insufficient evidence to assess Sprague's condition.  (Tr. 202).  On August 18, 2008, Dr. Balunas also completed a mental RFC assessment for Sprague.  (Tr. 216-218).  He found that Sprague was moderately limited in his ability to understand, remember and carry out

detailed instructions and in his ability to maintain attention and concentration for extended periods. (Tr. 216). In all other areas, Dr. Balunas found Sprague not significantly limited. (Tr. 216-17). He concluded that Sprague was capable of performing "unskilled work involving 1 and 2 step instructions with limited need for sustained concentration." (Tr. 218).

### iii.     Materials Submitted After the ALJ's Decision

After the ALJ issued his decision Sprague tendered additional evidence of his mental condition to the Appeals Council. One piece of evidence was a September 23, 2008, psychiatric examination conducted by Dr. Warner, who treated Sprague during his September 2008 inpatient care. (Tr. 666-68). Sprague reported that he had had suicidal ideation, but that a friend then told him to go to inpatient psychiatric care and they would help him detox from heroin. (Tr. 666). Sprague reported an angry and irritable mood since stopping heroin, which he claimed caused him to smash windows of a neighboring house. (*Id.*). He admitted he has "violent tendencies." (*Id.*). Sprague also reported insomnia, hopelessness, helplessness and a loss of interest. (*Id.*). He later denied hopelessness, helplessness and poor concentration. (Tr. 667). He denied current suicidal ideations. (Tr. 666). He admitted he had taken drugs because they made him calm because he had "always been hot headed and [would] do things with anger." (*Id.*). He stated that he quits jobs prematurely due to anger with his superiors. (*Id.*).

Upon examination, Dr. Warner found Sprague "irritable." (Tr. 667). His thoughts were logical, coherent and goal directed. He was alert and oriented, was able to name four presidents with prompts, his memory was intact, and concentration good. (*Id.*). He was able to perform simple math calculations and interpret one proverb correctly. (*Id.*). However, Dr. Warner found his functional judgment impaired and his insight poor. (*Id.*). He was diagnosed with "opioid induced mood disorder, rule out intermittent explosive disorder," opioid dependence,

polysubstance dependence in sustained partial remission, ADHD combined type, and antisocial personality disorder.  (Tr. 670).  She issued him a GAF of 50 and rendered a prognosis of "fair to guarded dependent on continued abstinence."  (*Id.*; Tr. 667).

Sprague also submitted an October 20, 2008 mental RFC assessment completed by Dr. Warner.  (Tr. 661-62).  Dr. Warner found that Sprague was moderately limited in his ability to: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others; make simple work-related decisions; complete a normal workday and work shift without interruptions from his psychologically based symptoms; and perform at a consistent pace without an unreasonable number of breaks.  (Tr. 661).  She also found him moderately limited in his ability to interact appropriately with the general public and markedly limited in his ability to: accept instructions and respond appropriately to criticism from a supervisor; get along with coworkers; and maintain socially appropriate behavior.  (Tr. 662).  In the comments section, Dr. Warner wrote that Sprague had limited employment opportunities due to his ten felonies and multiple years of incarceration.  (*Id.*).  In addition, she wrote that his "antisocial personality disorder [and] polysubstance dependence limits his social skills and ability to work cooperatively [with] others." (*Id.*).

Sprague also tendered discharge records from his inpatient substance abuse treatment in May 2009.  (Tr. 671-72).  At discharge he was found to be oriented, with an intact memory, blunted affect, poor judgment and insight, appropriate thought content and no suicidal thoughts.  (Tr. 672).  His risk of relapse was medium to high.  (*Id.*).  While the physician noted that no mental health issues were identified during the course of treatment, Sprague was diagnosed with opioid dependency, ruling out depressive disorder, adult ADHD and OCD.  (*Id.*).  He was issued

a GAF score of 41 and a poor prognosis.  (*Id.*).  He refused aftercare services.  (*Id.*).

Finally, Sprague tendered records from outpatient treatment by Catholic Charities.  (Tr. 675-89).  A psychological evaluation conducted on June 25, 2009, showed Sprague taking lithium and Dexeril at the time for his conditions.  (Tr. 682).  Upon assessment, he was oriented, cooperative, with a normal mood and speech, calm motor activity, intact thought process, and normal thought content.  (Tr. 684-85).  His mood was angry, however.  (Tr. 684).  He denied hallucinations or delusions.  (Tr. 685).  His identified risk factors included unsafe sex practices and medication management.  ((*Id.*).  There was no risk of suicide or threat to others.  (Tr. 686).  His strengths included daily activities, school, work, physical health, safety, legal, cognitive functioning, housing, social skills, impulse control and responsibility.  (Tr. 687).  His concerns were family and social relationships.  (*Id.*).  He was diagnosed with bipolar disorder, NOS and ADHD.  (*Id.*).  He was assessed a GAF score of 50.  (Tr. 688).  A crisis plan was put in place on July 9, 2009, and at a follow-up appointment on July 23, 2009, Sprague walked out.  (Tr. 677-81).  He was not seen again and was discharged on April 27, 2010.  (Tr. 675-76).

> b.    *Shoulder Pain*

On March 30, 2007, Sprague was seen in the emergency room for pain in his right shoulder and neck following an assault.  (Tr. 294-308).  A CT scan of his cervical spine revealed "moderate disk space narrowing at the C5-C6 level, with suggesting [sic] of a mild bony encroachment on the C5-C6 neural foramina on the right.  Mild degenerative change is noted at the C4, C5 and C-6 vertebral bodies.  Vertebral body height and alignment is well-maintained.  Prevertebral [sic] soft tissues are normal."  (Tr. 306).

X-rays taken of Sprague's right shoulder on November 11, 2008, showed no acute fracture or dislocation, well-maintained joint spaces and no soft tissue abnormality.  (Tr. 589).

At a November 12, 2008 appointment with Dr. Roger Kilbourn at Clio Family Healthcare, Sprague reported moderate right shoulder and upper back pain that had been going on for ten years and which interfered with his activities of daily living.  (Tr. 579).  Sprague reported reduced mobility of his shoulder and increased pain with all shoulder movements.  (*Id.*).  Dr. Kilbourn noted a loss of power and a reduced range of motion in his shoulder.  (Tr. 579-80). Sprague was diagnosed with a frozen shoulder and the doctor ordered an MRI.  (*Id.*).  He was also prescribed Lortab for the pain.  (*Id.*).  Sprague again complained of right shoulder pain and weakness at a November 26, 2008 appointment with Dr. Kilbourn, alleging that it had been a problem for "15-20 years".  (Tr. 577).  He reported that his MRI had been denied.  (*Id.*).  Dr. Kilbourn referred Sprague to University of Michigan, Flint for his right shoulder pain and prescribed Naprosyn.  (Tr. 578).  His shoulder pain was noted again at appointments on January 6, 2009, January 20, 2009, and March 10, 2009.  (Tr. 569-76).

At a May 1, 2009, appointment with Dr. Kilbourn, Sprague reported right shoulder pain that had been continuing for more than twenty years.  (Tr. 567).  He noted that his right shoulder pain was severe, a 9 out of 10.  (*Id.*).  He had noted some relief with NSAIDS.  (*Id.*).  Upon examination it was noted that abduction was 30 degrees, flexion 10 degrees and extension 20 degrees. (*Id.*).  He also had instability.  (*Id.*).  Sprague reported that his pain was exacerbated by movement.  (*Id.*).  Dr. Kilbourn continued his Lortab, and attempted again to order an MRI.  (Tr. 568).  At an appointment on July 8, 2009, Sprague reported moderate bilateral shoulder pain after an injury a few days prior lifting weights.  (Tr. 565).  He reported radiation of pain and mild weakness in his left arm.  (*Id.*).  Dr. Kilbourn ordered an x-ray of Sprague's left shoulder and continued his Lortab and Naprosyn.  (Tr. 566).  X-rays taken of Sprague's left shoulder on the same day revealed no acute fracture, although there was a remote healed fracture of the mid shaft

16

of the clavicle.  (Tr. 588).  At a follow-up appointment on August 7, 2009, Sprague reported worsening pain in his right shoulder and a limited range of motion.  (Tr. 563).  Upon examination, Dr. Kilbourn noted weakness in Sprague's right shoulder, ordered an MRI, and continued his Lortab.  (Tr. 564).  X-rays taken of Sprague's right shoulder on August 7, 2009, showed osteoarthritis, but no fracture or dislocation.  (Tr. 587).  An MRI of Sprague's right shoulder taken on August 22, 2009, found pre-disposition to impingement, "supraspinatus tendinosis [sic] without tear," and suggested "quadrilateral space syndrome with notable atrophy, fatty infiltration and denervation edema involving the teres minor."  (Tr. 585-86).

At an appointment on September 3, 2009, Sprague continued to report worsening right shoulder pain and a loss of power in his right arm with pain of 8 out of 10.  (Tr. 561).  Dr. Kilbourn referred Sprague to an orthopedist regarding "right shoulder impingement."  (Tr. 562). At an appointment on October 2, 2009, Sprague reported bilateral shoulder pain, worse on his right than his left, ranging from a 2-6 out of 10, while stating that he "feels better overall and no back pain."  (Tr. 559).  On exam, the doctor noted bilateral shoulder pain with spasms, tenderness and restricted motion.  (Tr. 560).  Sprague was prescribed a Medrol Dose Pack.  (*Id.*). At a follow-up on October 20, 2009, Sprague reported that his right shoulder pain was still an 8-10 out of 10, but his left shoulder pain was gone.  (Tr. 557).  He felt the Medrol Dose Pack "helped great, first time no left shoulder pain in 4 years."  (*Id.*).  Upon examination, the doctor noted crepitus and a decreased range of motion in his right shoulder.  (Tr. 558).

Notes from a November 16, 2009 appointment with Dr. Paul Telehowski of Family Orthopedic Associates found Sprague reporting that he had bilateral ongoing shoulder pain stemming from an injury six months prior for which he was supposed to receive physical therapy but could not due to insurance restrictions.  (Tr. 544-46).  While lifting weights at home, he

17

noted a marked increase in the pain and intermittent pain since.  (Tr. 545).  Upon examination,

Dr. Telehowksi noted full overhead elevation of both arms and no limitation on internal rotation,

but pain in reaching to the T12 level.  (Tr. 546).  Sprague was tender over the anterior lateral

aspect of his shoulder, but his AC joints were not tender.  (*Id.*).  His manual muscle strength did

not reproduce any significant weakness, and there was no gross motor weakness, but he did have

positive impingement signs.  (*Id.*).  X-rays taken the same day revealed "maintenance of

glenohumeral articulation without noted degenerative changes."  (*Id.*).  However, there was a

"marginal ostephytic spur present on the underside of the acromion of each shoulder."  (*Id.*).

There were no fractures or dislocations.  (*Id.*).  An MRI taken showed "thickening of the

supraspinatus tendon without discrete tear" and "some fatty atrophy present within the teres

minor which may be consistent with a quadrilateral space syndrome."  (*Id.*).  Dr. Telehowski

recommended physical therapy and ultrasound treatment.  (*Id.*).

At a December 4, 2009 appointment at Clio Family Healthcare, Sprague reported

bilateral shoulder pain and tenderness of between a 4 and 8 out of 10 on a pain scale.  (Tr. 555).

He reported that pain medication helped.  (*Id.*).  He was diagnosed with osteoarthritis of the

bilateral shoulders.  (*Id.*).  He was prescribed Lortab.  (Tr. 556).  At a December 23, 2009

appointment, Sprague reported chronic pain in his shoulder that was a 7-8 out of 10 on a pain

scale.  (Tr. 553).  He reported that it affected his sleep, work and household activities.  (*Id.*).  His

Lortab was continued.  (Tr. 554).  At a January 22, 2010 appointment, Sprague reported right

shoulder pain that had been recurring for more than ten years, and that was currently an 8-9 out

of 10 on a pain scale.  (Tr. 551).  An MRI noted impingement.  (*Id.*).  Upon examination the

practitioner noted a limited range of motion.  (Tr. 552).

4. *Vocational Expert's Testimony*

VE Ann Tremblay testified at the hearing. She was asked by the ALJ to identify Sprague's prior work as a cook and a hi-lo driver. (Tr. 40). She identified the cook position as medium and semi-skilled and the hi-lo driver position as light and semi-skilled. (*Id.*). The ALJ then asked the VE to imagine a hypothetical claimant of Sprague's age, educational and vocational background who was able to perform work involving one and two-step instructions with a limited need for sustained concentration. (*Id.*). The ALJ asked whether such a person could perform Sprague's past work. (*Id.*). The VE testified that he could not. (*Id.*).

The ALJ then asked if there were other jobs in the national or regional economy that such a person could perform. (*Id.*). The VE testified that there were such jobs, including dishwasher (4,300 positions in the regional economy), bench assembly (15,000 positions) and laundry worker, (2,400 positions). (Tr. 40-41). The ALJ then modified the hypothetical to include limitations of an inability "to engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week, for a 40 hour work week or an equivalent work schedule." (Tr. 41). He asked whether jobs existed in the economy for such a person. (*Id.*). The VE responded in the negative. (*Id.*).

**C.    Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that Sprague was not disabled.  At Step One he determined that Sprague had not engaged in substantial gainful employment since his alleged onset date.  (Tr. 17).  At Step Two, the ALJ found Sprague to have the following severe impairment:  bipolar disorder.  (Tr. 17-19).  At Step Three he determined

that Sprague's impairment did not meet or medically equal a listed impairment.  (Tr. 19-20).

The ALJ then assessed Sprague's RFC, finding him capable of performing "a full range of work

at all exertional levels but with the following nonexertional limitations:  The claimant is able to

perform unskilled work involving 1 and 2 step instructions with limited need for sustained

concentration."  (Tr. 20).  At Step Four the ALJ determined Sprague could not perform his prior

work, and at Step Five he concluded that, based on Sprague's age, education, vocational history

and RFC, as well as VE testimony, he was capable of performing a significant number of jobs in

the economy such that he was not disabled.  (Tr. 22-23).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative

decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the

Court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not

remand for further administrative proceedings unless the claimant has been prejudiced on the

merits or deprived of substantial rights because of the agency's procedural lapses.") (internal

quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's

decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide

21

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.   Analysis**

Sprague argues that the ALJ's decision was not supported by substantial evidence for several reasons. First, he argues that the ALJ erred in selectively citing record evidence that supported his conclusion, including relying on the GAF score of 70 that Sprague was assessed when he was discharged from his second psychiatric inpatient treatment, while ignoring the other GAF scores in the file, which ranged from 15 to 55 and denoted serious symptoms. In support of

this argument, Sprague relies, in part, on evidence submitted for the first time to the Appeals Council.  Second, Sprague argues that the ALJ erred in not finding his shoulder condition and his ADHD to be severe impairments and in not considering them in rendering his assessment of Sprague's RFC.  The court finds merit only in Sprague's second argument, and it will address that argument first below.

### 1.      Sprague's Shoulder Pain

The court agrees with Sprague that the ALJ erred in his evaluation of Sprague's alleged shoulder pain, and that that error not only resulted in an incorrect conclusion that the condition was not "severe," but more importantly, materially impacted the ALJ's RFC assessment to such a degree that the court cannot say that assessment is supported by substantial evidence.

A diagnosis, in and of itself, is not conclusive evidence of disability because it does not reflect the limitations, if any, that it may impose upon an individual.  *See Young v. Sec'y of Health and Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *Wallace v. Astrue*, 2009 U.S. Dist. LEXIS 126136, 2009 WL 6093338 at *8 (S.D. Ohio December 1, 2009).  Thus, only a diagnosis that constitutes or results in a severe impairment is relevant at Step 2.  *Vereen v. Comm'r of Soc. Sec. Admin.*, 10-2571, 2011 U.S. Dist. LEXIS 139498 at * 12 (N.D. Ohio Dec. 5, 2011).  However, the term "severe" at Step 2 denotes a *de minimus* standard.  (*Id.*).

In his decision, the ALJ stated that the evidence in the record of Sprague's shoulder condition, "indicates problems for only the past 6 months and it would not meet durational requirements."  (Tr. 19).  In support of this conclusion, the ALJ discussed only the one-time treating evaluation of Dr. Telehowski, the orthopedic specialist Sprague was sent to in 2009.  The ALJ failed to discuss the myriad treating records of Sprague's primary care physicians, both before and after his appointment with Telehowski.  A brief review of these records show that the

23

condition had persisted since at least 2007, and even if only since 2008, lasted longer than one year since his first x-rays were in November 2008 and his treatment records for his shoulder continue through at least January 2010. (Tr. 552; 589). During that time, Sprague was seen twelve times by his primary care doctors for shoulder pain. (*See generally* II.B.3.b above).

"Although an error at Step 2 will not always require reversal[2], such an error may require remand if the diagnosis and other evidence in the record support a finding of functional limitations that the ALJ failed to consider or include in a later step of the sequential analysis, when considering a claimant's RFC." *Blackburn v. Astrue*, No. 09-943, 2011 U.S. Dist. LEXIS 78259, 9-10 (S.D. Ohio Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 78258 (S.D. Ohio July 19, 2011). Here, although the ALJ concluded that "the clinical and diagnostic record does not support [Sprague's] complaints" of shoulder problems (Tr. 19), it is clear that the ALJ based that decision only on medical records for the prior six months, while failing to note Sprague's lengthy history of shoulder problems. (*Id.*). After noting Sprague's "testi[mony] that he injured his shoulder at work in 1988, and that he had trouble with pain from time to time," the ALJ then rejected it because he found "the evidence indicates problems for only the past 6 months [which] would not meet durational requirements." (*Id.*).

That finding was erroneous. The treatment notes in the record routinely reference Sprague's reports of severe shoulder problems, with a history that stems back to the 1980s. Those notes support, rather than contradict, his testimony. Furthermore, medical examinations of Sprague's treating physicians consistently found a limited range of motion in Sprague's right arm that could materially affect his ability to perform some postural functions necessary for certain occupations that the ALJ found Sprague could perform. (Tr. 558; 552; 560; 567; 579-

---

[2] *See infra* at 27-28.

24

80).  Therefore, because the ALJ apparently did not consider any of those other treatment records in forming his RFC analysis, his failure to find the condition severe at Step 2, and, more importantly, to incorporate any related exertional limitation into his RFC, was not harmless error, but error which requires remand.

### 2.   The ALJ's Consideration of Evidence of Mental Condition

While the court finds that this case should be remanded for further consideration on Sprague's shoulder condition, it does not agree with Sprague that the ALJ erred in his assessment of Sprague's mental conditions.

### a.   Sprague's GAF Scores

Sprague argues that the ALJ erred in failing to consider his consistently low GAF scores, and in focusing on the one GAF score out of nine that reflected less than serious symptoms.  The court finds no merit in this argument.[3]

---

[3] While hardly mentioning it as such, Sprague's argument relies in part on evidence he tendered to the Appeals Council in the first instance, evidence which was not available to the ALJ at the hearing or before he issued time of his decision (specifically, the September 23, 2008 psychiatric examination by Dr. Warner, the October 20, 2008 mental RFC assessment by Dr. Warner, the May 2009 inpatient drug treatment records, and 2009 outpatient records from Catholic Charities).  (*See* Tr. 661-62; 666-68; 671-72; 675-89).  The Commissioner did not address this fact, and instead addressed the "new" evidence on its merits.  However, the court notes that the rule in this Circuit is that such evidence cannot be considered unless the plaintiff requests a remand under Sentence 6 of the Act, and makes a showing of newness, good cause and materiality.  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (holding that where Appeals Council considers new evidence but declines to review claimant's application, court cannot consider new evidence in deciding whether to uphold or reverse ALJ's decision unless the evidence is material and there was good cause for failure to present it in the prior proceeding).  Here, Sprague has not asked for such a remand, nor has he made the requisite showing of good cause.  While the evidence presumably is material, without a finding of good cause, the evidence's materiality is irrelevant.  *See Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984) (finding that failure to satisfy "good cause" requirement prevents court from remanding case even if new evidence is deemed material); *see also Robinson v. Sec'y of Health & Human Servs.*, No. 90-2304, 1991 U.S. App. LEXIS 10743 at *6 (6th Cir. May 15, 1991) (same); *Brown v. Comm'r of Soc. Sec.*, No. 10-12960, 2011 U.S. Dist. LEXIS 136050 at *11-12 (E.D. Mich. Nov. 28, 2011) (evidence that is new and material nevertheless does not warrant

First, the Commissioner is correct that an ALJ need not put any stock into GAF scores when determining whether a claimant's mental health condition prevents them from working. *See White v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 124355 (E.D. Mich. Oct. 27, 2011).  A GAF score is "not dispositive of anything in and of itself, but rather [is] only significant to the extent that that it elucidates an individual's underlying mental issues." *Id.* quoting *Oliver v. Comm'r of Soc. Sec.*, 415 Fed. Appx. 681 (6th Cir. 2011).  While the ALJ here did mention two GAF scores in his opinion, his failure to mention the other GAF scores is not error where he made specific references to the underlying treatment notes upon which those GAF scores were based.  *See Oliver*, 415 Fed. Appx. at 684 (finding GAF scores inapposite where underlying analysis suggests that claimant's mental condition not as severe as alleged).  This is particularly true here, where Sprague's lowest GAF scores were assessed during times when he was on heroin, *supra* at 5-7, and when his treatment notes while clean showed mental functioning significantly greater than his then GAF scores would suggest, supra at 9-11.

Though the ALJ did not perform a formal comparison of Sprague's mental health condition both on and off heroin (*see e.g. Monateri v. Comm'r of Soc. Sec.*, 436 Fed. Appx. 434, 441 (6th Cir. 2011), he discussed evidence showing Sprague's symptoms were not as severe when he was sober and compliant with medication.  (Tr. 21).  While the court notes that the ALJ was factually incorrect when he stated that "there is no evidence to show [Sprague's] GAF scores continued to remain low when he was drug free and complaint [sic] with prescribed medication," (Tr. 21), this is harmless error where substantial evidence in the record shows that, even by his own admission, Sprague's underlying symptoms improved during the period after

remand where good cause is not established).  Accordingly, the court will not consider that evidence in its analysis.  At any rate, logically, the ALJ could not have erred in failing to consider records that were not presented to him prior to his decision being issued.

quitting heroin and while he was compliant with his medication.  For example, while a crisis center intake form on January 22, 2010 found that Sprague was at risk of injuring himself or another, (Tr. 641), the evidence suggests that he was not on medication at the time, and Dr. Khan had written him new prescriptions at his subsequent appointment three days later on January 25, 2010.  (Tr. 625; 633; 655; *supra* at 9).  More importantly, the evidence shows that at Sprague's appointment the very next day, he was found to have been taking his newly prescribed medications and felt that he would be good as long as he was taking them and attending therapy. (Tr. 653).  His mood had greatly improved from his intake appointment, as he now presented with an appropriate affect compared to the "irritable and depressed affect" he presented with at intake.  (Tr. 654; 657).  At a January 28, 2010 appointment, it was noted that Sprague's only risk factor was his medical health problems.  (Tr. 652).  By February 2010, Sprague's symptoms showed great improvement, and he was noted as being cooperative, calm and very talkative with a regulated mood and normal affect.  (Tr. 607).  Furthermore, the therapist noted that Sprague currently had no reports of violence or thoughts of violence against others and that his strengths were his daily activities, his cognitive functioning, housing, social skills, impulse control and responsibility.  (Tr. 609-10).  While Sprague's GAF scores remained the same throughout these treatment records, (Tr. 610; 625; 641), it is clear from the treatment notes just discussed that his symptoms and mental functioning had greatly improved while on medication, which is consistent with the ALJ's finding.  (Tr. 21).  For these reasons, the court finds that the ALJ did not err in his consideration of Sprague's GAF scores.

### b.    *Sprague's ADHD*

Sprague also argues, albeit briefly, that the ALJ's failure to find his ADHD a severe condition also requires remand.  This argument lacks merit.  In and of itself, an ALJ's failure to

find a particular condition severe at Step Two in the analysis cannot constitute reversible error when an ALJ finds at least one other condition severe at Step Two. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) ("Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error" where he had found another severe condition existed). This is because once the ALJ finds a severe impairment at Step II, he moves on to the remaining sequential steps where he considers the claimant's severe and non-severe impairments. *Id.*; *See also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008); *Fisk v. Astrue*, 253 Fed. Appx. 580, 584 (6th Cir. 2007) (noting that once the ALJ determines at least one severe impairment, he "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'") (citing Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5); *Pompa v. Comm'r of Soc. Security*, 73 Fed. Appx. 801, 803 (6th Cir. 2003). Here, the ALJ found Sprague had one severe impairment, and he then considered Sprague's ADHD in his RFC assessment when he limited Sprague to 1 to 2 step tasks with little need for sustained concentration. This limitation adequately accounts for Sprague's ADHD, given that his limitations in concentration, persistence and pace were found to be only moderate. (Tr. 198, 216, 635). *See Bradley v. Comm'r of Soc. Sec.*, No. 11-12359, 2012 U.S. Dist. LEXIS 64498 at *15-16 (E.D. Mich. Apr. 17, 2012) *adopted by* 2012 U.S. Dist. LEXIS 64713 (E.D. Mich. May 8, 2012) (limitation to simple, routine, repetitious tasks, with one- or two-step instructions sufficient to account for moderate limitation in concentration, persistence and pace).

### c.   *Dr. Warner's Limitations*

Sprague also argues that the ALJ erred in failing to consider Dr. Warner's limitations in his RFC assessment. The Commissioner argues that the ALJ had good reason not to consider

them.  However, as the court found above, these particular records were not actually before the

ALJ in the first place – the best reason for the ALJ's "failure" to consider them.  Thus, the ALJ

could not have erred in this regard.  (*See supra* fn. 2).

In sum, remand is not warranted as to Sprague's alleged mental impairments.  To that

end, the court notes that the additional evidence submitted to the Appeals Council need not be

considered by the ALJ upon remand, as it is not relevant to the sole defect detected in these

proceedings – regarding Sprague's alleged shoulder impairments.  *See Faucher v. Sec'y of

Health and Human Servs.*, 17 F.3d 171, 175 (6th Cir. 1994) (holding that where remand occurs

under Sentence Four of the Act, the ALJ can be ordered to consider additional evidence "to

remedy a defect in the original proceedings, a defect which caused the [Commissioner's]

misapplication of the regulations in the first place."); *see also Davis v. Comm'r of Soc. Sec.*, No.

10-14137, 2011 U.S. Dist. LEXIS 152176 at *41-42 (E.D. Mich. Dec. 30, 2011) *adopted by*

2012 U.S. Dist. LEXIS 7942 (E.D. Mich. Jan. 24, 2012).

## III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Sprague's Motion for

Summary Judgment **[8]** be **GRANTED**, the Commissioner's Motion **[11]** be **DENIED**, and that

this case be **REMANDED** back to the ALJ for further consideration consistent with this Report

and Recommendation.

Dated: August 7, 2012                                    s/David R. Grand
Ann Arbor, Michigan                                     DAVID R. GRAND
                                                        United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific

objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140

(1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*,

638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail

to raise others with specificity, will not preserve all the objections a party might have to this

Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record
and any unrepresented parties via the Court's ECF System to their respective email or First Class
U.S. mail addresses disclosed on the Notice of Electronic Filing on August 7, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager